# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 07-578 (WJM) |
| **v.** | **OPINION** |
| **SHARPE JAMES and**<br>**TAMIKA RILEY,** | **HON. WILLIAM J. MARTINI** |
| **Defendants.** |  |

**For the United States**:
   Judith H. Germano
    *Assistant United States Attorney*
   Phillip H. Kwon
    *Assistant United States Attorney*
   Perry Primavera
    *Special Assistant United States Attorney*
   United States Attorney's Office
   970 Broad Street
   Newark, NJ 07102

**For Defendant James:**
   Thomas R. Ashley
   50 Park Place, Suite 1400
   Newark, NJ 07102

   Alan L. Zegas
   552 Main Street
   Chatham, NJ 07928

   Raymond A. Brown
   One Gateway Center, Suite 105
   Newark, NJ 07102

**For Defendant Riley:**
   Gerald Krovatin
   Krovatin Klingeman LLC
   744 Broad Street, Suite 1903
   Newark, NJ 07102

**MARTINI, U.S.D.J.:**

Sharpe James served as Mayor of Newark, New Jersey for twenty years,

from 1986 until 2006, and as a New Jersey Senator from 1999 until January 2008.

On July 12, 2007, a federal grand jury in Newark returned a thirty-three count

Indictment against James and a co-defendant, Tamika Riley.  The Indictment

charges that while in office, James participated in several schemes that formed a

pattern of fraudulent and corrupt conduct, some of which accrued to the benefit of

Riley.  The Indictment alleges that James and Riley had a close personal

relationship.  Riley was President and Chief Executive Officer of Tamika Riley,

Inc., also known as Tamika Riley Images, Inc. ("TRI"), a public relations firm

specializing in the entertainment industry.

The Indictment against James and Riley can essentially be divided into four

different sets of charges.  James alone is charged in the first set of charges

(hereinafter, the "credit card scheme"), which allege that James schemed to

defraud the City of Newark by misusing City credit cards and other means to pay

personal, non-government expenses.  The Indictment alleges that over a period of

about five years, James charged more than $52,000 in improper expenses to the

City.  Some of the expenses were incurred locally, and others were incurred while

James was traveling domestically and abroad.  The Indictment also alleges that

James was frequently accompanied in his travels by one or more individuals who

are described in the Indictment.  In connection with the credit card scheme, James

is charged with seventeen counts of mail and wire fraud under 18 U.S.C. §§ 1341

and 1343 (Counts One through Seventeen) and three counts of fraud involving a

local government receiving federal funds under 18 U.S.C. § 666(a)(1)(A) (Counts

Eighteen through Twenty).

In the second set of charges (the "real estate scheme"), the Indictment

alleges that James misused his official positions as Mayor and State Senator to

improperly favor Riley by steering sales of City-owned property to Riley at steeply

discounted prices.  The properties were sold to Riley under the South Ward

Redevelopment Plan ("SWRP"), a program instituted by the City Council to

facilitate the rehabilitation of the South Ward neighborhood.  The SWRP

contemplated that the City would sell certain properties, most of which were

vacant, to qualified developers at prices below market value for the purpose of

building market-rate housing on the sites.  The Indictment alleges that Riley

lacked the experience and financial stability to qualify as a developer under the

SWRP, and that in most cases, Riley resold the properties for lucrative profits

without first redeveloping them as the SWRP required.  In connection with the real

estate scheme, James and Riley are charged with three counts of mail fraud in

violation of 18 U.S.C. § 1341 (Counts Twenty-One through Twenty-Three) and

one count of fraud involving a local government receiving federal funds under 18 U.S.C. § 666(a)(1)(A) (Count Twenty-Four).

In addition, Count Twenty-Five charges both James and Riley in an overarching conspiracy to use the United States mail to defraud the public of James's honest services, in violation of 18 U.S.C. §§ 371, 1341 and 1346, and encompassing the conduct described in both the credit card scheme and the real estate scheme.

Riley alone is charged in the remaining counts. In the third set of charges (the "Section 8 scheme"), the Indictment alleges that between December 2001 and September 2005, Riley misrepresented her income and employment status and fraudulently obtained housing subsidies from the New Jersey Department of Community Affairs Housing Assistance Program to assist her in paying rent at her apartment in Jersey City, New Jersey. Riley is charged with four counts of mail fraud under 18 U.S.C. § 1341 (Counts Twenty-Six through Twenty-Nine). In the fourth set of counts, Riley is charged with violations of the federal tax code. Count Thirty alleges that Riley violated 26 U.S.C. § 7206(1) by filing a Form 1120 for tax year 2001 which intentionally failed to disclose her real estate activities and associated gross receipts of more than $98,000. Count Thirty-One alleges a similar violation of 26 U.S.C. § 7206(1) for tax year 2002, charging that Riley intentionally failed to disclose her real estate activities and associated gross

4

receipts of more than $43,000.  Count Thirty-Two alleges that for calendar year 2005, Riley filed a Form 1120S for TRI which underreported real estate gains by more than $60,000, in violation of 26 U.S.C. § 7206(1).  Count Thirty-Three alleges that Riley, in violation of 26 U.S.C. § 7201, attempted to evade the assessment of federal income taxes for tax year 2005 by intentionally failing to file a Form 1040 individual tax return for that year despite earning gross income of approximately $93,761, and by making false statements to her accountant in the course of preparing a Form 1040 which she intentionally did not file.

On November 5, 2007, James and Riley filed separate pretrial motions requesting a variety of relief.  Following oral argument on December 19, 2007, the Court ruled on a majority of Defendants' motions, including James's Motion to Dismiss the Indictment, which was denied.  The Court reserved judgment on Riley's Motion for Severance.  At a January 8, 2008 hearing, the Court ordered a severance of the Indictment into three parts: (1) the real estate scheme and the tax counts; (2) the credit card scheme; and (3) the Section 8 scheme.  On January 11, 2008, the Government asked the Court to reconsider the three-part severance, arguing that the Section 8 scheme should remain joined with the real estate scheme and the tax counts.  The Court agreed, and ordered on January 15, 2008 that only the credit card scheme should be severed.

The Court writes now to supplement its December 19, 2007 ruling on James's Motion to Dismiss and its January 8 and 15, 2008 rulings on Riley's Motion for Severance.

## I.      MOTION TO DISMISS THE INDICTMENT

James argues that the Indictment fails to plead sufficient facts to establish a violation of federal law, and must therefore be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(B).  Riley joins in James's motion to the extent that the arguments are applicable to her.

An indictment will generally be deemed sufficient so long as it "'(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.'"  *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)).  "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Rankin*, 870 F.2d at 112.

In evaluating the sufficiency of an indictment, the Court must assume the truth of the facts alleged therein.  *United States v. Panarella*, 277 F.3d 678, 681

(3d Cir. 2002).  "It is well-established that '[a]n indictment returned by a legally constituted and unbiased grand jury . . . *if valid on its face*, is enough to call for trial of the charge on the merits.'"  *Vitillo*, 490 F.3d at 320 (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956)) (emphasis added in *Vitillo*).

As discussed below, the Indictment against James and Riley is facially valid.  James's arguments to the contrary are essentially challenges to the Government's evidence, which do not render the Indictment insufficient as a matter of law.

### A.    Counts One through Twenty

In Counts One through Seventeen, James is charged under 18 U.S.C. §§ 1341 and 1343 with mail and wire fraud in connection with improper expenditures on credit cards funded by the City of Newark.  In Counts Eighteen through Twenty, James is charged with fraud involving a local government receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).

James argues that each of these counts must be dismissed because the Indictment fails to allege that the money James misspent did not come from his unrestricted annual salary, which included a $25,000 allowance in lieu of expenses and a car/fringe allowance of $780.  The Court disagrees.  Although the Indictment does mention James's salary and its various components, the credit card allegations are unequivocally directed at James's improper use of "two credit

7

cards funded by the City of Newark." (Indictment 5 ¶ 4.)  As such, the Indictment clearly alleges that the City's money was misappropriated for James's personal use.  The language in the Indictment is sufficient to state a violation of the relevant statutes.[1]

James also argues that the City Council reviewed his mayoral expenses at the end of each budget year and could have, but did not, question the allegedly improper expenses.  This, again, is an argument for trial which has no bearing on the sufficiency of the Indictment.

### B.    Counts Twenty-One through Twenty-Five

In Counts Twenty-One through Twenty-Five, James and Riley are charged with mail fraud (Counts Twenty-One to Twenty-Three), fraud involving a local government receiving federal funds (Count Twenty-Four), and conspiracy to commit honest services fraud (Count Twenty-Five).  The Court will address the Indictment's sufficiency as to each offense in turn.

### 1.    Mail Fraud:  Counts Twenty-One through Twenty-Three

Counts Twenty-One through Twenty-Three charge James and Riley with committing mail fraud under 18 U.S.C. § 1341 in connection with the real estate

---

[1]  Moreover, the Government has represented that it will, in fact, prove that the inappropriate expenditures were *not* made from any portion of James's salary, but were charged to City credit cards and paid directly out of the City's budget.  Whether or not the Government will succeed in its proofs is a matter of evidence to be adduced at trial, not a proper challenge to the sufficiency of the Indictment.

scheme.  The substantive elements of mail fraud are (1) the existence of a scheme to defraud; (2) the use of the mails, whether the United States Postal Service or a private carrier, in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant (*i.e.*, participation by the defendant with specific intent to defraud).  *United States v. Dobson*, 419 F.3d 231, 236–37 (3d Cir. 2005).

The Indictment describes the particulars of the real estate scheme at length. It alleges that James and Riley knowingly and willfully devised a scheme to defraud the City of money and property by means of materially false and fraudulent pretenses, representations, and promises.  Specifically, the Indictment alleges that James misused his official positions to improperly favor Riley and to obtain money and property for the direct benefit of Riley and the indirect benefit of himself and others.  It describes efforts by James to steer sales of discounted City-owned real estate to Riley, who would in turn sell the properties for a profit, often without meeting the City's requirements.  It alleges that the real estate sales contracts provided that no City official should have any direct or indirect personal interest in the contracts, but that James nonetheless executed the sales contracts on behalf of the City despite his close personal relationship with Riley.  The Indictment describes both Defendants' culpable participation in the scheme, and details how the Defendants used the United States mail in furtherance of the

scheme.  The allegations in the Indictment are sufficient to charge a violation of the mail fraud statute.

James raises several general challenges to Counts Twenty-One through Twenty-Three, which he argues are equally applicable to Counts Twenty-Four and Twenty-Five.  First, James argues that the Indictment fails to allege that he engaged in any *quid pro quo* exchange in connection with the real estate scheme. He notes that there is no allegation that he gave the City Council any benefit in exchange for its actions on Riley's applications to purchase City real estate, nor is there any indication that Riley gave James any benefit that was conditioned upon James's support of her applications.  However, no such *quid pro quo* is required to prove mail fraud.  *See Dobson*, 419 F.3d at 236–37 (describing substantive elements of mail fraud as (1) the existence of a scheme to defraud, (2) use of the mails in furtherance of the fraudulent scheme, and (3) participation by the defendant with specific intent to defraud); *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (holding that one who participates in a scheme to defraud is guilty even if he does not personally benefit from the scheme).  As discussed in more detail below, James and Riley are not charged with bribery or with any other offense that necessitates a *quid pro quo*.[2]

Second, James argues that he did not control the City's sales of real estate.

---

[2]  *See infra* Parts I.B.2–3.

He points out that because of the delegation of powers in Newark's government, the Mayor plays a limited role in sales of City property, which in every case are subject to the approval of the City Council.  Although it is true that James lacked the power to *unilaterally* convey City properties, the Indictment alleges that James and his office were nonetheless intimately involved in sales of City real estate and that James exercised essential influence at every step of the process.  With respect to Riley, the Indictment specifically alleges (1) that James directed employees of the Department of Economic and Housing Development ("DEHD") to sell City properties to Riley; (2) that Riley went to James's office to complain when she felt she was not getting help from DEHD; (3) that the DEHD, part of the executive branch, drafted proposed resolutions authorizing sales of the properties to Riley and sent them to the City Council; and (4) that once the resolutions were passed, James, among others, executed the sales contracts on behalf of the City.  Essentially, the Indictment alleges that the sales of City real estate to Riley would not have taken place without James's influence.  James's arguments to the contrary are evidentiary disputes for trial, not absolute defenses to prosecution.  At this stage, the dismissal of an indictment "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges."  *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000).

Finally, James argues that even if it were true — as the Indictment alleges — that Riley's applications contained inaccuracies, there is no allegation that James was aware of the inaccuracies, approved of them, or took any action to compel the City Council to vote in any particular way. These specific allegations are not required elements of any of the offenses charged, and their absence does not render the Indictment insufficient as a matter of law. Once again, these arguments are properly directed at the sufficiency of the Government's evidence at trial.

### 2. Fraudulent Conversion of City Property: Count Twenty-Four

Count Twenty-Four charges a violation of 18 U.S.C. § 666(a)(1)(A), tracking the language of the statute in alleging that James and Riley "knowingly and willfully did embezzle, steal, obtain by fraud and without authority convert to defendant Riley's own use certain properties and monies . . . and intentionally misapplied the monies . . . which were the approximate values of these real properties" owned by the City. (Indictment 69 ¶ 3.) Count Twenty-Four targets Riley's purchase and resale, without rehabilitation, of two City properties in 2005. The Indictment describes the facts and circumstances of these purchases at length, providing sufficient detail to support the statutory violations alleged.

As with the mail fraud counts, James argues that as a matter of law, the Government cannot show that he embezzled, stole or converted City properties within the meaning of the statute because it was not within his power to do so. Once again, however, this argument is premature.  Despite the City Council's key role in the process, the Indictment alleges that James exercised influence and essentially directed the sales of City real estate to Riley.  Although James may argue at trial that in reality he had no such influence, his arguments do not, at this stage, render the Indictment insufficient as a matter of law.

James also points out, again, that there is no allegation of any *quid pro quo*. Because James is not charged with a violation of the bribery portions of the statute,[3] the Indictment need not allege that James directly benefitted from the fraudulent conversion of property to Riley.

### 3.    Conspiracy to Commit Honest Services Mail Fraud: Count Twenty-Five

Count Twenty-Five alleges that James and Riley conspired to commit honest services mail fraud, contrary to 18 U.S.C. §§ 1341 and 1346, in violation of § 371.  Under § 1346, the meaning of "scheme to defraud" under the mail fraud and related statutes includes "a scheme or artifice to deprive another of the intangible right of honest services."

---

[3]  Sections 666(a)(1)(B) and 666(a)(2) require exchange or solicitation of something of value with intent to influence official action, but § 666(a)(1)(A) contains no such requirement.

James argues that Count Twenty-Five is deficient insofar as it depends upon his alleged influence over Riley's real estate transactions with the City. Again, he contends that only the City Council held the power to convey City property. As with the other counts, however, James's culpable participation in the honest services fraud conspiracy does not become a legal impossibility simply because of the City Council's role in the real estate transactions.

Finally, James argues that under the Third Circuit's recent decision in *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007), a bribery theory of honest services fraud requires evidence of a *quid pro quo*, which the Indictment in this case fails to allege. *Id.* at 281. James's reliance on *Kemp* is misplaced, because James is not charged under a bribery theory of honest services fraud. Instead, the Indictment alleges that the public was deprived of James's honest services by his concealment of material information, as well as a personal conflict of interest, in violation of his fiduciary duty to the public and in violation of state law. For the purposes of the alleged conspiracy, it is not necessary that James received any benefit from the scheme to defraud — only that he participated in the scheme. "A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants," because where such a scheme is successful, "the public is deprived of its servants' honest services no matter who receives the proceeds." *Spano*, 421 F.3d at 603. The Indictment's language is

14

sufficient to allege that James and Riley conspired to commit honest services mail fraud.

## II.   MOTION FOR SEVERANCE

The Indictment returned by the Grand Jury in this case charges James alone in the credit card scheme and Riley alone in the Section 8 scheme and the tax counts.  James and Riley are charged together in the real estate scheme and in the overarching honest services fraud conspiracy.

Riley argues that her joinder in the Indictment with James is both improper under Fed. R. Crim. P. 8(b) and unduly prejudicial under Fed. R. Crim. P. 14, and moves for severance.  James joins in the motion.  The Government objects to any severance, arguing that the Indictment returned by the Grand Jury describes a single systematic pattern of theft, corruption, and abuse of power in which both James and Riley participated.

The propriety of joinder in a multi-defendant case is determined under Rule 8(b).  *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003).  Rule 8(b) is less permissive than Rule 8(a), which governs joinder of offenses against a single defendant.  Under Rule 8(b), it is not sufficient that defendants are involved in offenses of the same or similar character; instead, "there must exist a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions.'"  *United States v. Jimenez*, No. 05-

15

4098, 2008 U.S. App. LEXIS 715, at *43 (3d Cir. Jan. 14, 2008) (quoting Fed. R. Crim. P. 8(b)).

"Joint trials of defendants named in a single indictment are favored because they 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *Id.* at *42 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).  Nonetheless, Rule 14 recognizes that joinder, even when proper under Rule 8, may prejudice a defendant or the government.  *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Therefore, Rule 14 provides that if a joint trial "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

When defendants have been properly joined under Rule 8, a court should grant severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Nonetheless, "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Id.* at 541.

16

### A.    Credit Card Scheme

While the real estate scheme, the Section 8 scheme and the tax counts are all factually interrelated and involve overlapping proofs, the credit card scheme is essentially distinct.  Regardless of whether joinder of the credit card scheme is proper under Rule 8(b), the Court finds that severance of Counts One through Twenty is warranted under Rule 14.

In considering a grant of severance, the Court must balance the risk of prejudice to the defendants against the public interest in joint trials and the risk of inconsistent verdicts.  *Id.* at 537–38.  Here, the Court finds a clear and substantial risk that joinder of the credit card scheme could prejudice both James and Riley. Although James's alleged misuse of City credit cards is charged as part of the honest services fraud conspiracy in Count Twenty-Five, there is no allegation that Riley had any knowledge of, or involvement in, the acts comprising the credit card scheme.  Due to the number and complexity of the charges arising from the credit card scheme, there is a clear risk that the evidence on those charges would unfairly spill over into the Government's case against Riley, and that the jury would be unable to compartmentalize the distinct evidence against her.

Joinder also creates a risk of prejudice against both Defendants, but perhaps James in particular, due to the allegations in the credit card scheme that James was often accompanied by various women in his travels.  Even without knowing

17

precisely what the evidence will be at trial regarding James's relationships with these women, it is clear to the Court that such allegations have the potential to incite strong emotion in jurors and distract them from the merits of the case. This risk of prejudice is not unmanageable, but the Court can exercise greater control over potential prejudice in a separate trial. A separate trial will also limit any possible spillover effects.

Severance also furthers the interests of judicial economy in this case. Due to the nature and volume of the transactions involved in the credit card scheme, joinder would likely add many weeks to an already lengthy trial, creating an excessive burden on the jury system and potentially rendering the trial unwieldy, unmanageable, and confusing. *See United States v. Price*, 13 F.3d 711, 717 (3d Cir. 1994). Severance will therefore conserve judicial resources. Moreover, because the credit card scheme involves separate evidentiary proofs, the Government will not be forced to duplicate much of its case in a second trial. Therefore, severance is not likely to cause undue waste of prosecutorial resources. Similarly, because the credit card scheme is distinct from the other schemes, there is no risk of inconsistent verdicts.

Finally, the Court notes that both James and Riley agree with this severance, as their counsel expressed in open court on December 19, 2007 and January 8,

2008.  For these reasons, Riley's Motion for Severance is granted insofar as the credit card scheme will be severed from the remainder of the Indictment.

### B.      Real Estate Scheme, Section 8 Scheme, and Tax Charges

#### 1.      Rule 8(b)

Examining the remaining counts under Rule 8(b), the Court concludes that the real estate scheme, Section 8 scheme, and tax charges are properly joined.

James and Riley are properly joined in the charges involving the real estate scheme, Counts Twenty-One through Twenty-Five, because those charges arise from a common series of acts or transactions in which both James and Riley allegedly participated — Riley's property transactions with the City, with which James purportedly assisted.  Although James is not alleged to have played any role in the tax fraud or the Section 8 scheme, Rule 8(b) explicitly provides that "[a]ll defendants need not be charged in each count."  Therefore, those schemes are properly joined because they also arise from Riley's property transactions with the City.  Riley's alleged misrepresentations and omissions regarding the business and income of TRI — specifically, her failures to properly report income derived from the real estate transactions — form the basis for her liability in the tax fraud and tax evasion counts as well as the Section 8 scheme.

Therefore, joinder of the real estate scheme, Section 8 scheme and tax counts is proper under Rule 8(b).

### 2.   Rule 14

Next, in balancing the risk of prejudice to James and Riley against the public interest in joint trials and the risk of inconsistent verdicts, the Court concludes that no severance among the remaining counts is warranted under Rule 14.

The rules governing joinder and severance "are designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" *Zafiro*, 506 U.S. at 540 (quoting *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) (alteration added in *Zafiro*).  The goals underlying Rule 14 are met, in this case, by a joint trial of James and Riley on the counts in which they are both charged — namely, the real estate scheme and the honest services fraud conspiracy.  The severance of the credit card scheme minimizes the potential for spillover of prejudicial evidence, and limiting instructions to the jury will suffice to cure any remaining risk of undue prejudice.

Considerations of judicial economy also weigh in favor of maintaining the Indictment's joinder of the Section 8 scheme and tax charges with the real estate scheme.  Although a severance among these counts would not force the Government to offer precisely the same proof in each trial, there would certainly be substantial overlap in the required evidence.  Evidence of the real estate sales

20

and profits is integral to the Government's case on the tax fraud, tax evasion, and Section 8 fraud counts, because those charges involve Riley's alleged failure to properly disclose the profits of the real estate scheme.  Similarly, as the Government argued when it urged the Court to reconsider the initial severance order, the fact that Riley was receiving Section 8 housing assistance at the same time as she was purchasing properties from the City is relevant to the allegations that Riley was financially unqualified to act as a developer under the SWRP.

James argues that because he is not charged in the Section 8 scheme or the tax counts, he will be prejudiced by their inclusion in the trial.  He contends that even though the Indictment contains no allegation of any knowledge or involvement on his part in Riley's Section 8 scheme, the jury could still infer that James, in his official capacities as Mayor and Senator, somehow exercised influence over Riley's applications for Section 8 assistance in Jersey City.  Both parties also argue that the evidence on the Section 8 scheme has the potential to inflame the jury; Riley contends that a jury could convict her on other counts simply because they view her as a "welfare cheat," while James contends that he will be prejudiced by association.  The Court believes that these risks can be fully managed at trial with specific limiting instructions to the jury, and are not so grave as to potentially "prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* at 539.

For these reasons, Riley's motion seeking a complete severance from James as well as a severance of the Section 8 scheme and the tax counts from the real estate scheme is denied.

### C.   *Bruton* Issues and Severance

Prior to her arrest but after the conclusion of the alleged conspiracy, Riley made a series of statements to federal agents which the Government plans to introduce against her at trial.  Citing *United States v. Bruton*, 391 U.S. 123 (1968), James moves to exclude evidence of those statements, arguing that insofar as Riley's statements refer to him, their admission at the joint trial would violate his rights under the Confrontation Clause if Riley elects not to testify.[4]

Evidence that is probative of one defendant's guilt, but which is technically admissible only against a co-defendant, can present a risk of prejudice that may necessitate a severance if the risk is high.  *Zafiro*, 506 U.S. at 539.  However, severance is not required if the risk of prejudice can be otherwise ameliorated.  As the Supreme Court has recognized, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  *Id*. (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

---

[4]  Although James does not explicitly request a severance on the basis of *Bruton* issues, the Court feels obligated to address this subject in the context of the Defendants' arguments under Rule 14.

After carefully reviewing the F.B.I.'s reports of Riley's statements, the Court ruled on December 19, 2007 that Riley's statements can be redacted in a manner that satisfies the concerns articulated in *Bruton* and its progeny. *See Gray v. Maryland*, 523 U.S. 185, 188–89, 192–97 (1998); *Richardson*, 481 U.S. at 206–08. Should Riley elect not to testify, a limiting instruction advising the jury that it may not consider Riley's statements as evidence against James will cure any residual risk of prejudice. Therefore, in this case, neither suppression of the statements nor a severance is necessary to satisfy *Bruton*.

## III.   CONCLUSION

For the foregoing reasons, James's Motion to Dismiss the Indictment is **DENIED**. Riley's Motion for Severance, in which James has joined, is **GRANTED** insofar as the credit card scheme will be severed from the remainder of the Indictment, and is **DENIED** in all other respects. With all references to the credit card scheme removed, the conspiracy charge, Count Twenty-Five, will remain tied to the real estate scheme, the Section 8 scheme, and the tax charges. An appropriate Order accompanies this Opinion.

**Dated:** February 8, 2008

                s/William J. Martini
                **William J. Martini, U.S.D.J.**